IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Magistrate Judge Boyd N. Boland

Civil Action No. 07-cv-02041-CMA-BNB

MICHAEL GENE YOUNG,

Plaintiff,

v.

THOMAS A. ESKESTRAND, M.D.,
ORVILLE NEUFELD, PhD D.O.,
R. LINDSAY LILLY JR., M.D.,
LOUIS CABLING, M.D.,
GARY A. GO, M.D.,
KELLY WASKO, RN,
THEODORE LAWRENCE, PA,
TEJENDER SINGH, PA,
PATTY BEECROFT, M.D.,
DANNY ENGLUND, M.D.,
JOSEPH WERMERS, M.D.,
DEBRA HOWE, RN,
JOHN DOE AND JANE DOE 1-50,

Defendants.

_____

**RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**
_____

This matter is before me on the following motions:

1.   **Defendant Beecroft's Motion for Summary Judgment** [Doc. #134, filed

07/24/2009] (the "Beecroft Motion"); and

2.   **CDOC Defendants' Motion for Summary Judgment** [Doc. #144, filed 08/12/2009]

(the "DOC Motion").

I respectfully RECOMMEND that the motions be GRANTED and that summary

judgment be entered in favor of the defendants on all of the plaintiff's remaining claims.

## I.  STANDARD OF REVIEW

The plaintiff is proceeding *pro se*.  I must liberally construe his pleadings, <u>Haines v. Kerner</u>, 404 U.S. 519, 520-21 (1972), but I cannot act as his advocate.  A *pro se* litigant must comply with the fundamental requirements of the Federal Rules of Civil Procedure.  <u>Hall v. Bellmon</u>, 935 F.2d 1106, 1110 (10th Cir. 1991).

In ruling on a motion for summary judgment, the facts must be viewed in the light most favorable to the party opposing the motion, and that party must be afforded the benefit of all reasonable inferences to be drawn from the evidence.  <u>Adickes v. S. H. Kress & Co.</u>, 398 U.S. 144, 157 (1970).  Rule 56(c), Fed. R. Civ. P., provides that summary judgment should be rendered "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of demonstrating by reference to portions of pleadings, discovery and disclosure materials on file, and any affidavits, the absence of genuine issues of material fact.  <u>Celotex Corp. v. Catrett</u>, 447 U.S. 317, 323 (1986).  "The moving party may carry its initial burden either by producing affirmative evidence negating an essential element of the nonmoving party's claim, or by showing that the nonmoving party does not have enough evidence to carry its burden of persuasion at trial."  <u>Trainor v. Apollo Metal Specialties, Inc.</u>, 318 F.3d 976, 979 (10th Cir. 2002).  The party opposing the motion is then required to go beyond the pleadings and designate evidence of specific facts showing that there is a genuine

issue for trial.  Celotex, 447 U.S. at 324.  Only admissible evidence may be considered when ruling on a motion for summary judgment.  World of Sleep, Inc. v. La-Z-Boy Chair Co., 756 F.2d 1467, 1474 (10th Cir. 1985).

## II.   UNDISPUTED MATERIAL FACTS

The plaintiff is incarcerated by the Colorado Department of Corrections ("DOC").  He filed his Amended Prisoner Complaint (the "Complaint") on March 6, 2008 [Doc. #28].

The Complaint asserts seven claims.  All of the claims allege violations of the Eighth and Fourteenth Amendments.  Claim One is based on the treatment of the plaintiff's ganglion cyst. Claim Two is based on the treatment of his carpal tunnel syndrome.  Claim Three alleges inadequate medical treatment for his hands after he was engaged in a fight.  Claim Four alleges inadequate medical treatment for a rash he suffered when PA Lawrence changed his medication from Benadryl to CTM.  Claim Five is based on the DOC's inmate co-pay policies.  Claim Six alleges that the plaintiff was not informed that five years ago he had high glucose levels.  Claim Seven alleges that several defendants took money from the plaintiff's inmate account for medical co-pay charges without a signed release from him.  The plaintiff seeks compensatory, declaratory, and injunctive relief.  *Complaint*, p. 8B.[1]

Many of these claims have been dismissed.  *Order Adopting and Affirming Recommendations of United States Magistrate Judge* [Doc. #107].  The following claims remain: Claim One insofar as it alleges that defendants Wasko and Laurence violated the Eighth Amendment in relation to their treatment of the plaintiff's ganglion cyst; Claim Two to the extent it alleges that defendants Wasko and Beecroft violated the Eighth Amendment in

---

[1]I cite to the page numbers of the Complaint as they are assigned by the plaintiff.

3

connection with their treatment of the plaintiff's carpal tunnel syndrome; and Claim Three's allegations that defendant Howe provided inadequate medical treatment for the plaintiff's hands after he was engaged in a fight for in violation of the Eighth Amendment.  Id.

Although the plaintiff disputes many of the defendants' factual statements, generally he does not support his own version of the facts with competent evidence.  In addition, his responses are filled with conclusory allegations.  In my analysis of the motions, I consider only factual statements that are supported by evidence.

Moreover, it is not a judicial function to search the record for evidence which supports the plaintiffs' claims.  See Gross v. Burggraf Construction Co., 53 F.3d 1531, 1546 (10th Cir. 1995).  Rather, it is the litigants' responsibility to provide the court with concise arguments, relevant facts, and specific citations to authorities and supporting evidence.  Toth v. Gates Rubber Co., 2000 WL 796068 *8 (10th Cir. 2000).

Under C.D. Mosier v. Maynard, 937 F.2d 1521, 1524 (10th Cir. 1992), a plaintiff's complaint may be treated as an affidavit under Fed. R. Civ. P. 56(e) to the extent it contains statements that are based on personal knowledge and are sworn as true under penalty of perjury. I have relied on the factual assertions in the Complaint to the extent they are based on personal knowledge and to the extent they support factual statements asserted in the plaintiff's responses to the defendants' motions.

In his Complaint, the plaintiff makes numerous references to supporting documents.  The supporting documents are not attached to the Complaint; they are found in Document #17, which

was submitted with a previously filed amended complaint.[2]  I construe the documents as having

been submitted with the extant Complaint.  In his Complaint, the plaintiff often misstates the

contents of the documents.  In those instances, I quote directly from the documents.

1.  The plaintiff is currently incarcerated by the Colorado Department of Corrections

("DOC").  He has been an inmate at the Arkansas Valley Correctional Facility ("AVCF") since

2004.  *Beecroft Motion*, Ex. A-2, p. 27, ll. 1-9.  Defendant Beecroft was a physician working at

AVCF from May 2004 through January 2007.  Id. at Ex. A-1, ¶ 2.  At all times pertinent to the

allegations of the Complaint, defendants Wasko and Howe were nurses at AVCF and defendant

Laurence was a Physician's Assistant at AVCF.  *Complaint*, p. 2A, ¶¶ 7, 8; p. p. 2B, ¶ 13.

2.  On September 1, 1999, the plaintiff was evaluated by Dr. Eskestrand, an orthopedic

surgeon.  Dr. Eskestrand diagnosed the plaintiff with a ganglion cyst of the left wrist and

recommended removal of the cyst.  *Complaint*, p. 3 and 3A; *Affidavit of Dr. Paula Frantz[3]*

("Frantz Aff."), ¶ 8; *DOC Motion*, Ex. A-1.

3.  On December 23, 1999, the plaintiff was evaluated by Dr. Eskestrand following

surgery to remove the cyst.  *Complaint*, p. 3A; *Frantz Aff.*, ¶ 9; *DOC Motion*, Ex. A-2.  The

plaintiff said that Dr. Eskestrand had missed the ganglion.  *Complaint*, p. 3A.  Dr. Eskestrand

documented that the plaintiff was concerned about swelling in his wrist and that there was no

---

[2]The pages of Doc. #17 are not consecutively numbered.  Therefore, I cite to the page numbers of Doc. #17 as they are assigned by the Court's docketing system.

[3]The Affidavit of Dr. Paula Frantz is attached to the DOC Motion [Doc. #144] as Exhibit A and attached to Defendant Beecroft's Reply in Support of Motion for Summary Judgment [Doc. #149] as Exhibit A-3.

recurrence of the ganglion but there was some scarring.  *Complaint*, p. 3A; *Frantz Aff.*, ¶ 9; *DOC Motion*, Ex. A-2.

4.   On August 2, 2002, the plaintiff was seen by Dr. Louis Cabling for an electromyography.  In his report, Dr. Cabling states that the plaintiff has a bony mass in his left wrist area and that his symptoms are suggestive of carpal tunnel syndrome.  Dr. Cabling recommended conservative treatment and splint immobilization.  *Complaint*, p. 3A and Doc. #17, pp. 12, 14.

5.   On November 6, 2003, Shireen Wrigley evaluated the plaintiff in the prison clinic. The plaintiff was given a steroid injection into his wrists.  *Frantz Aff.*, ¶ 11; *DOC Motion*, Ex. A-4; .

6.   On December 12, 2003, the plaintiff was seen by Shireen Wrigley as a follow up tot he wrist injections.  The plaintiff reported that there was no improvement in his wrists following the injections.  Wrists splints were prescribed for carpal tunnel syndrome.  *Frantz Aff.*, ¶ 12; *DOC Motion*, Ex. A-5; *Plaintiff's Response to Defendants' Motion for Summary Judgment* [Doc. #152] (the "Response to DOC Motion"), p. 3, ¶ 6.

7.   On January 5, 2004, the plaintiff was evaluated by Shireen Wrigley for a follow up on his wrists.  The medical provider documented "recheck wrists (1 month) - worse now" and requested a consult with an orthopedic surgeon.  *Frantz Aff.*, ¶ 13; *DOC Motion*, Ex. A-6; *Response to DOC Motion*, p. 3, ¶ 7.

8.   On February 25, 2004, the plaintiff was evaluated by Dr. Go, an orthopedic surgeon. Dr. Go documented that the plaintiff was complaining that he still had a mass following the surgery to remove the ganglion cyst from his left wrist.  Dr. Go further documented that there

was no ganglion cyst present on physical exam and that the lump the plaintiff referred to was a

"bump on his bone."  Dr. Go noted that the electromyography done by Dr. Cabling on August 2,

2002, showed mild to moderate bilateral carpal tunnel syndrome.  He offered the plaintiff a

carpal tunnel release surgery because the plaintiff had not responded to anti-inflammatory

medications and splinting.  Dr. Go documented that he told the plaintiff that he was uncertain if

the surgery would benefit the plaintiff and that the plaintiff was instructed to think about the

surgery.  *Frantz Aff.*, ¶ 14; *DOC Motion*, Ex. A-6; *Response by Plaintiff to Patty Beecroft's*

*Motion for Summary Judgment* [Doc. #147] (the "Response to Beecroft Motion"), Ex. B.[4]

9.   On May 9, 2004, the plaintiff was evaluated in the medical clinic for a request for

steroid injections in his wrists.  The provider noted that he had been evaluated by an orthopedic

surgeon and that he had been informed about surgery.  The provider noted an extensive

discussion about medications.  The plaintiff agreed to a trial of Tegretol for his symptoms.  The

plaintiff was instructed to submit a kite to the medical department if he wished to proceed with

surgery.  *Frantz Aff.*, ¶ 15; *DOC Motion*, Ex. A-8.

10.   On August 23, 2004, the plaintiff was evaluated in the clinic for a request for

surgery on his wrists.  The provider, P.A. Laurence, requested a referral to Dr. Go to follow-up

on the surgery request.  Dr. Beecroft co-signed the health record on August 27, 2004.  *Frantz*

*Aff.*, ¶ 16; *DOC Motion*, Ex. A-9; *Response to Beecroft Motion*, Ex. D.

---

[4]In the plaintiff's responses to the Beecroft Motion and the DOC Motion, Exhibits A-F
and Exhibits I-P are identical.  In addition, many of the exhibits contained in the responses are
identical to the exhibits in Doc. #17.  None of the plaintiff's exhibits are authenticated.
However, the defendants do not object to the exhibits.  I have considered them insofar as they
are material.

11.   On September 21, 2004, the plaintiff was seen by P.A. Laurence for a rash. Laurence documented that the plaintiff thought his August 23rd visit should have counted as a follow up visit.  Laurence explained that the visit was not just a follow up because it also included a discussion about his referral to Dr. Go for possible surgery.  The health record was co-signed by Dr. Beecroft on October 3, 2004.  *Response to Beecroft Motion*, Ex. E.

12.   On October 28, 2004, the plaintiff was seen by Dr. Beecroft for upper respiratory symptoms and wrist pain.  Dr. Beecroft documented that the plaintiff believed he had rheumatoid arthritis in his wrists and hands.  She ordered lab studies to evaluate the plaintiff for evidence of rheumatoid arthritis.  The lab results were normal.  *Frantz Aff.*, ¶ 17; *DOC Motion*, Ex. A-10; *Response to Beecroft Motion*, Ex. I and Ex. J.

13.   On December 2, 2004, the plaintiff was seen by Dr. Beecroft for arthralgia in his knees, shoulders, wrists, and hands.  She documented that his hand grasp was "a little weak." She prescribed Diprosone and Rheumatrex.  *Response to Beecroft Motion*, Ex. J.

14.   On January 28, 2005, P.A. Laurence renewed the plaintiff's prescription for Tegretol.  *Response to DOC Motion*, Ex. R.

15.   On July 29, 2005, Laurence documented "no kite receive[d], only a note without any signature asking to renew Tegretol.  I will renew for 90 days and then he will need to be seen on sick call for any renewals."  *Response to DOC Motion*, Ex. S.

16.   On September 14, 2005, the plaintiff was evaluated by Dr. Beecroft for back pain, knee arthritis, and a complaint of carpal tunnel syndrome.  Dr. Beecroft documented that both hands were strong to grasp and that the carpal tunnel syndrome did not seem to be "a bad

problem now."  The plaintiff was prescribed Ibuprofin.  *Frantz Aff.*, ¶ 18; *DOC Motion*, Ex. A-11; *Response to Beecroft Motion*, Ex. K.

17.    On February 13, 2006, Dr. Beecroft documented that she notified the plaintiff by mail that Benadryl was no longer available from the DOC pharmacy and that she would substitute his Benadryl prescription with Chor-Trimeton.  *Response to Beecroft Motion*, Ex. N.

18.    At approximately 12:40 p.m. on July 6, 2006, the plaintiff engaged in a fight with another inmate in the Chow Hall.  *Response to DOC Motion*, Ex. BB.  At approximately 12:47 on July 6, 2006, D. Howe, R.N., completed an anatomical examination of the plaintiff.  She documented that the plaintiff's knuckles were red on both hands and that the left hand was bruised and swollen in the area of the fifth finger.  *Frantz Aff.*, ¶ 19; *DOC Motion*, Ex. A-12.

19.    On July 12, 2006, the plaintiff submitted a kite for medication refills.  Dr. Beecroft renewed the plaintiff's prescriptions for Chlor-Trimeton, Motrin, and Tegretol.  There is no indication the plaintiff complained of hand issues.  *Frantz Aff.*, ¶ 20; *DOC Motion*, Ex. A-13; *Response to Beecroft Motion*, Ex. O.

20.    On August 1, 2006, nurse John Klein evaluated the plaintiff for a complaint of infection under the right arm.  The record does not show any evidence that the plaintiff expressed any concern about his hands or fractures.  *Frantz Aff.*, ¶ 21; *DOC Motion*, Ex. A-14.

21.    On December 14, 2006, the plaintiff saw Dr. Beecroft.  She informed the plaintiff that because he does not have rheumatoid arthritis, he does not have a condition that qualifies for the chronic care clinic.  She further informed him that if he had bone and joint problems, he would need to submit a kite.  Finally, she documented that he had been scheduled to return to Dr. Go on October 13, 2004, but the visit was "not completed" and that if he wanted to "re-open the

Carpal Tunnel issue, he had to kite into sick call." *Beecroft Motion*, Ex. A-1, ¶ 3and Attachment A; *Frantz Aff.*, ¶ 22; *Response to Beecroft Motion*, Ex. F; *Frantz Aff.*, ¶ 22; *DOC Motion*, Ex. A-15.

22.   Administrative Regulation 700-30 (for medical visit co-pays) defines chronic care as limited to cardiovascular disease, diabetes, pulmonary disease, seizures, HIV, and chronic mental health conditions.  Dr. Beecroft was following the Administrative Regulation when the plaintiff was removed from the chronic care clinic because neither carpal tunnel syndrome nor ganglion cysts qualify for the chronic care clinic.  *Frantz Aff.*, ¶ 22.

23.   On January 3, 2007, the plaintiff filed a Step 1 Grievance, No. CaV06/07-233 (the "233 Grievance"), complaining that he had been scheduled for carpal tunnel surgery for more than three years.  *Response to Beecroft Motion*, Ex. H.  Also on January 3, 2007, he filed a Step 1 Grievance, No. CAV06/07-232 (the "232 Grievance"), complaining that he was taken off chronic care because he did not have rheumatoid arthritis.  Doc. #17, p. 24.

24.   On January 24, 2007, Dr. Beecroft responded to the 232 Grievance.  She again advised the plaintiff that "Rheumatoid Arthritis is a chronic care condition, but Degenerative Arthritis, Carpal Tunnel Syndrome, Spinal Spurs, and allergies are not under chronic care, even though they may be persistent conditions."  She again advised the plaintiff that he would have to submit a kite to "sick call" for any condition he wanted to treat.  *Beecroft Motion*, Ex. A-1, ¶ 4 and Attachment B; *Response to Beecroft Motion*, Ex. P; Doc. #17, p. 24; *Frantz Aff.*, ¶ 23; *DOC Motion*, Ex. A-16.

25.   On February 4, 2007, the plaintiff submitted a kite to sick call requesting a surgical consultation.  *Response to DOC Motion*, Ex. H, third consecutive page.  On February 9, 2007,

10

P.A. Laurence documented that the plaintiff did not appear for a clinic appointment which was scheduled in response to a kite received on February 6, 2007, in which the plaintiff requested a surgical consult.  Laurence further documented that the plaintiff could resubmit a kite if he felt he still needed to be evaluated for a surgical consult.  *Frantz Aff.*, ¶ 24; *DOC Motion*, Ex. A-17; *Response to DOC Motion*, Ex. H. third consecutive page.

26.   On March 2, 2007, defendant Wasko responded to a grievance filed by the plaintiff complaining that he was not eligible for the chronic care clinic.  Wasko responded that the health issues identified by the plaintiff are not recognized for chronic care.  Wasko's response was consistent with the version of Administrative Regulation 700-30 then in effect.  *Frantz Aff.*, ¶ 25; *DOC Motion*, Ex. A-18.

27.   On March 5, 2007, the plaintiff filed a Step 1 grievance complaining that he was wrongfully charged $5.00 for a "no show" medical visit.  A medical provider (not Wasko) responded:

> You were scheduled on sick call in response to a kite that you submitted in reference to a surgical consult.  Surgical consult evaluations are first conducted by a provider at the facility.  If a consult is granted then you will be referred by a provider.  However, you were a no-show for this appointment.  The charge is valid.  Grievance denied.

*Response to DOC Motion*, Ex. G, first consecutive page.

28.   April 19, 2007, Wasko responded to the plaintiff's Step 2 grievance.  The plaintiff indicated in his grievance that he did not want an appointment in the clinic but instead wanted an appointment with a surgeon/specialist for his carpel tunnel syndrome.  Wasko responded that "[n]o referral for surgery will ever be fulfilled without being evaluated by a provider and the provider authorizing the referral.  Although you feel you have not received medical attention,

11

your chart review shows the providers are monitoring you appropriately and I will not challenge their professional judgment." *Frantz Aff.*, ¶ 26; *DOC Motion*, Ex. A-19; *Response to DOC Motion*, Ex. G, second consecutive page.

29.   All surgical consults require an evaluation by a DOC clinical provider.  The provider must perform an examination, order diagnostic testing as warranted, and establish a diagnosis.  A specialty consult must be requested by a DOC provider after an evaluation and only when medically necessary.  *Frantz Aff.*, ¶ 54.

30.   On December 14, 2007, the plaintiff was evaluated by P.A. Laurence in the clinic for a kite containing a complaint of arthritis, carpal tunnel, ganglion cyst, allergies and migraines.  The plaintiff's kite did not raise any issue regarding broken hands.  The plaintiff was advised that not all of the issues could be addressed in one visit.  The plaintiff elected to be seen for his allergies.  He was treated with a steroid injection for allergies.  He also received a prescription for motrin for pain and was advised to submit a kite if he was still having symptoms. *Frantz Aff.*, ¶ 27; *DOC Motion*, Ex. A-20.

31.   On December 18, 2007, the plaintiff was seen in the clinic by P.A. Singh for a complaint concerning pain in both of his wrists.  The plaintiff indicated that he had fiberglass splints which were confiscated during a shake down.  Singh's note indicated that an EMG done in 2002 (by a primary care physician) showed moderate carpal tunnel syndrome.  Singh ordered splints for the hands.  Singh also prescribed Motrin and Tegretol for pain.  *Frantz Aff.*, ¶ 28; *DOC Motion*, Ex. A-21.

32.   On January 29, 2008, P.A. Singh evaluated the plaintiff in the clinic for a complaint that he was not tolerating the Tegretol.  Singh discontinued the Tegretol and documented that the plaintiff reported the wrist splints "helped him a lot."  *Frantz Aff.*, ¶ 29; *DOC Motion*, Ex. A-22.

33.   On April 2, 2008, Michael Aasen evaluated the plaintiff in the clinic for complaints of allergies, headaches, and hand pain.  The plaintiff indicated that he was in constant pain despite the splints.  Dr. Aasen documented that the plaintiff "[c]linically is worse and has some thenar muscle wasting on exam."  He ordered a repeat EMG to document the severity of the carpal tunnel syndrome.  *Frantz Aff.*, ¶ 30; *DOC Motion*, Ex. A-23; *Response to DOC Motion*, Ex. A.

34.   On May 14, 2008, an electromyography was performed by Dr. Sunku, a board certified neurologist.  The test showed mild carpal tunnel syndrome in the left hand only.  The right hand was normal.  *Frantz Aff.*, ¶ 31; *DOC Motion*, Ex. A-24.

35.   On May 22, 2008, Dr. Aasen evaluated the plaintiff in the clinic to follow up on the electromyography.  Dr. Aasen documented that the plaintiff had an intact neurological examination and no muscular atrophy of the hands.  The plaintiff was diagnosed with mild carpal tunnel syndrome of the left hand.  Dr. Aasen documented that he encouraged the plaintiff to avoid repetitive hand movement and that the plaintiff indicated he would like to try the Tegretol again for pain.  This medication was prescribed.  *Frantz Aff.*, ¶ 32; *DOC Motion*, Ex. A-25.

36.   On May 28, 2008, Dr. Aasen documented that the plaintiff submitted a kite indicating the Tegretol was causing headaches and "vision issues."  Dr. Aasen discontinued the medication.  *Frantz Aff.*, ¶ 33; *DOC Motion*, Ex. A-26.

37.   On June 30, 2008, Dr. Aasen evaluated the plaintiff in the clinic for a complaint about carpal tunnel syndrome.  Dr. Aasen documented that the plaintiff had a good hand grip bilaterally, negative Tinnel's test and negative Phalen's test.  He further documented that the electromyography demonstrated mild carpal tunnel in the left hand only.  Dr. Aasen's impression was that the symptoms were not supported by objective findings of the electromyography and the examination.  This appointment was scheduled and billed as a chronic care clinic visit. *Frantz Aff.*, ¶ 34; *DOC Motion*, Ex. A-27.

38.   On August 21, 2008, the plaintiff did not appear for a chronic care appointment to follow-up on carpal tunnel syndrome.  Dr. Aasen documented that the mild carpal tunnel syndrome of the left hand did not rise to the level of being a chronic care issue, and he discharged the plaintiff from the chronic care clinic.  *Frantz Aff.*, ¶ 35; *DOC Motion*, Ex. A-28.

39.   On September 18, 2008, Dr. Aasen evaluated the plaintiff in the clinic for a kite complaining of hand pain.  Dr. Aasen documented that the plaintiff indicated that the splints helped some; the pain was constant but was alleviated by tapping on the volar aspect of the wrist; there was no synovial thickening; the plaintiff was able to make a full fist; he had good pulses in the wrist; he had intact muscle strength of the hands; there was no muscular atrophy in the hands; the Tinnel's test and Phalen's test were negative; the issue had been difficult but the plaintiff had remained stable over several years; and the plaintiff indicated that the problem had been present since 1993.  *Frantz Aff.*, ¶ 36; *DOC Motion*, Ex. A-29.

40.   On November 13, 2008, Dr. Aasen evaluated the plaintiff for continued complaints of hand and forearm pain.  Dr. Aasen reported that the plaintiff's current employment situation was improved significantly in terms of decreasing repetitive hand movements but there was no

benefit in terms of symptoms.  Dr. Aasen documented that the plaintiff had tried a number of

medications including Baclofen, Elavil, Tegretol, Effexor, and multiple non-steroidal anti-

inflammatory agents without benefit.  The physical exam again documented full muscle strength

of the hands, no muscular wasting or atrophy of the hands, intact pulses in the wrist and negative

Tinnel's test.  Dr. Aasen again documented that the symptoms were not supported by the

objective findings of the exam and EMG.  Dr. Aasen ordered lab evaluations that might be

pertinent to rule out other causes of nerve injury.  Dr. Aasen noted specifically that the exam was

not consistent with carpal tunnel syndrome because tapping on the wrist eased the symptoms.

Dr. Aasen noted that if the labs were normal there was little else to add to the care plan given the

objective findings.  *Frantz Aff.*, ¶ 37; *DOC Motion*, Ex. A-30.

41.   On November 17, 2008, Dr. Aasen documented that the plaintiff requested a refill of

Indocin (a non-steroidal anti-inflammatory medication) by kite.  Dr. Aasen refilled the plaintiff's

Indocin prescription.  *Frantz Aff.*, ¶ 38; *DOC Motion*, Ex. A-31.

42.   On February 19, 2009, Dr. Aasen documented that the chart showed that the

plaintiff had an allergy to Indocin.  Dr. Aasen noted that the plaintiff's  previous medical records

were documented as lost so he could not validate a history of the allergy.  He also noted that

when the Indocin was prescribed, the plaintiff did not indicate an allergy to the medication.

However, Dr. Aasen discontinued the Indocin "to be safe."  *Frantz Aff.*, ¶ 39; *DOC Motion*, Ex.

A-32.

43.   The plaintiff had blood drawn for a comprehensive metabolic panel.  On March 23,

2009, the results showed that the plaintiff's evaluation was within normal limits.  *Frantz Aff.*, ¶

40; *DOC Motion*, Ex. A-33.

44.   The plaintiff was evaluated in the clinic on March 31, 2009, for two kites in which he complained that his medication was stopped and that he continued to have pain from carpal tunnel syndrome.  Specifically, the plaintiff claimed that he could not hold onto items.  P.A. Laurence documented that the plaintiff indicated that Indocin caused his throat to swell and that he noticed a rash.  The exam showed that the plaintiff had intact grip strength bilaterally and Tinnel's test was negative.  Laurence specifically documented that the plaintiff was not wearing his splints at this visit.  Laurence ordered an x-ray of the left arm.  Laurence requested Neurontin, a non-formulary medication, for pain.  *Frantz Aff.*, ¶ 41; *DOC Motion*, Ex. A-34.

45.   On April 2, 2009, the plaintiff received an x-ray of the left elbow and forearm.  The result noted that "[t]he visualized wrist and hand are unremarkable."  This x-ray would likely not have the complete hand on the film, but the radiologist clearly documented that the portion that is visible is normal.  *Frantz Aff.*, ¶ 42; *DOC Motion*, Ex. A-35.

46.   On April 7, 2009, P.A. Laurence documented that the non-formulary committee did not approve the request for Neurontin and recommended wrist splints and steroid injection instead.  *Frantz Aff.*, ¶ 43; *DOC Motion*, Ex. A-36.

47.   On April 22, 2009, a laboratory evaluation for uric acid and sedimentation rate were documented as normal.  The sedimentation rate was 1, a strong indication of the absence of inflammation.  *Frantz Aff.*, ¶ 44; *DOC Motion*, Ex. A-37.

48.   On May 14, 2009, the plaintiff had a steroid injection in the left wrist for pain.  *Frantz Aff.*, ¶ 45; *DOC Motion*, Ex. A-38.

49.   On June 9, 2009, P.A. Singh evaluated the plaintiff for a follow-up on his

carpal tunnel syndrome. Singh documented that he would not perform an injection in the plaintiff's right wrist because the plaintiff did not experience any benefit from the left wrist injection. Singh further documented that the plaintiff concurred with this decision. *Frantz Aff.*, ¶ 46; *DOC Motion*, Ex. A-39.

50. On June 23, 2009, P.A. Singh evaluated the plaintiff for complaints that his hands were cramping at night, his big toes were painful, all of his toes were swelling, and his knee and hips were hurting. The exam revealed there was no evidence of an inflammatory process, and no abnormalities were noted. Singh discontinued the Ibuprofen and prescribed Naproxen. An Arthritic Panel was ordered. *Frantz Aff.*, ¶ 47; *DOC Motion*, Ex. A-40.

51. On July 8, 2009, the laboratory evaluation showed that tests to evaluate for inflammatory arthritis were normal. The specific tests obtained were the Antinuclear Antibody, RA, C-reactive protein, and Antistreptolysin 0 Antibody. All were within the normal range. *Frantz Aff.*, ¶ 48; *DOC Motion*, Ex. A-41.

## III. ANALYSIS

This action is brought under 42 U.S.C. § 1983, which provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State, . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.

The defendants assert that they are entitled to qualified immunity on the plaintiff's claims. *DOC Motion*, pp. 20-22; *Beecroft Motion*, pp. 4-6. Qualified immunity shields government officials from liability for civil damages provided their conduct when committed did

not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Qualified immunity not only shields a defendant from unwarranted liability, it also protects the defendant from the burdens of defending a suit. Medina v. Cram, 252 F.3d 1124, 1128 (10th Cir. 2001). The qualified immunity defense is available only to government officials sued in their individual capacities. Buchwald v. University of New Mexico School of Medicine, 159 F.3d 487, 492 (10th Cir. 1998).

When a defendant asserts a qualified immunity defense on summary judgment, a heavy two-part burden shifts to the plaintiff. Medina, 252 F.3d at 1128. The plaintiff must establish that "the defendant's actions violated a constitutional or statutory right." Scull v. New Mexico, 236 F.3d 588, 595 (10th Cir. 2000) (internal quotations and citations omitted). The plaintiff must also show "that the constitutional or statutory right the defendant allegedly violated was clearly established at the time of the conduct at issue."[5] Id. "A right is clearly established only if there is a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts has found the law to be as the plaintiff maintains. Only if the plaintiff establishes both elements of the test does the defendant bear the traditional burden of showing that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law." Id. "If the plaintiff fails to satisfy either part of the two-part inquiry, the court must grant the defendant qualified immunity." Medina, 252 F.3d at 1128.

---

[5]The order in which I may consider these factors is discretionary. Pearson v. Callahan, __ U.S. __, __, 129 S. Ct. 808, 818 (2009); Manzanares v. Higdon, 2009 WL 2430643 *3 n.6 (10th Cir. Aug. 10, 2009).

The remaining claims all assert deliberate indifference to the plaintiff's medical needs in violation of the Eighth Amendment.  The government has a constitutional obligation to provide inmates with "a level of medical care which is reasonably designed to meet the routine and emergency health care needs of inmates."  Ramos v. Lamm, 639 F.2d 559, 574 (10th Cir. 1980). A prison official's deliberate indifference to an inmate's serious medical needs violates the inmate's Eighth Amendment right to be free from cruel and unusual punishment.  See Estelle v. Gamble, 429 U.S. 97, 104 (1976).  To establish a claim for deliberate indifference, a plaintiff must prove both an objective component and a subjective component.

The objective component is met if the inmate's medical need is sufficiently serious. Farmer v. Brennan, 511 U.S. 825, 834 (1994).  A medical need is sufficiently serious "if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  Hunt v. Uphoff, 199 F.3d 1220, 1224 (10th Cir.1999) (quoting Ramos v. Lamm, 639 F.2d 559, 575 (10th Cir. 1980)).       The subjective component to a deliberate indifference claim is met if a prison official "knows of and disregards an excessive risk to inmate health or safety."  Farmer, 511 U.S. at 837.  "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Id.

## A.  Claim One

Claim One alleges that defendants Wasko and Laurence violated the Eighth Amendment in relation to their treatment of the plaintiff's ganglion cyst.  *Complaint*, p. 4 (stating "[t]his claim is based on a Ganglion Cyst in my left wrist that Sergery [sic] was performed on to remove

but was not removed").  However, the Complaint does not contain any allegations to support a claim that Wasko and Laurence were involved in the treatment of the plaintiff's ganglion cyst.

Claim One alleges that (1) Laurence told the plaintiff he was scheduled for surgery to relieve his carpal tunnel syndrome; (2) Laurence wrongfully prescribed Tegratol for the plaintiff; and (3) Laurence told him that Dr. Go said he did not have a ganglion.  *Complaint*, p. 4C.

The plaintiff's first and third allegations do not state a claim for deliberate indifference, and the plaintiff has not provided any evidence to support his allegation that Laurence wrongfully prescribed Tegratol.  The only competent evidence in the record is that the plaintiff agreed to a trial of Tegretol for his pain symptoms on May 9, 2004; Laurence renewed the plaintiff's prescription for Tegretol on January 28, 2005; on July 29, 2005, Laurence documented "no kite receive[d], only a note without any signature asking to renew Tegretol.  I will renew for 90 days and then he will need to be seen on sick call for any renewals"; Dr. Beecroft renewed the plaintiff's prescription for Tegretal on July 12, 2006, in response to the plaintiff's request for a refill; P.A. Singh discontinued the Tegretol after evaluating the plaintiff for a complaint that he was not tolerating the Tegretol; Dr. Aasen documented that the plaintiff indicated he would like to try the Tegretol again for his pain and prescribed Tegretol for the plaintiff on May 22, 2008; and Dr. Aasen documented that the plaintiff submitted a kite indicating that the Tegretol was causing headaches and vision issues, and he discontinued the medication on May 28, 2008. There is no evidence in the record to demonstrate that Laurence wrongfully prescribed Tegratol.

Claim One's allegations against Wasko are that she told the plaintiff that he was not scheduled for surgery because he had not requested it; that he had to submit a kite to request a

surgical consult; and that he submitted a kite and did not receive an appointment because Wasko was harassing him and retaliating against him for filing grievances. *Complaint*, p. 4C.

Again, the plaintiff does not provide evidence to support these allegations. The record demonstrates that all surgical consults require an evaluation by a DOC clinical provider; the provider must perform an examination, order diagnostic testing as warranted, and establish a diagnosis; a specialty consult must be requested by a DOC provider after an evaluation and only when medically necessary; the plaintiff submitted a kite for a surgical consult; he was scheduled to see a DOC provider to evaluate the necessity for a surgical consult; he failed to appear for the appointment; he filed a grievance complaining that he submitted a medical kite for a surgical consult and not for an appointment with medical staff; and Wasko responded to his grievance by stating that he had to be seen by a DOC provider in order to obtain a referral to a surgeon.

There is no evidence that the plaintiff ever submitted another kite for a surgical consult, and there is no evidence that Wasko wrongfully denied the plaintiff an appointment or a surgical consult.

### 2. Claim Two

Claim Two is based on the alleged lack of proper treatment for the plaintiff's carpal tunnel syndrome. *Complaint*, p. 5 (stating that "[t]his claim is based on the CTS Carpal Tunnel Syndum [sic] that I have had in both hands for over 14 years and have not recieved [sic] the proper medical treatment for"). Claim Two has been dismissed except as to defendants Wasko and Beecroft.

The following are Claim Two's allegations against Beecroft and Wasko:[6]

> After waiing three years for [carpal tunnel] sergery that I was told I
> was scheduled for by Dr. BeeCroft, Danny Englund, Theodore
> Laurence, Kelly Wasko, Tejinder Singh, Joseph Wermers, I filed a
> grievance again in response to the grievances my medications were
> stopped and I was taken off chronic care.  I was told by medical
> staff that I would have to turn in a separate dite for each medical
> issue at 5.00 dollars per issue, "Like there their some kind of HMO
> or something!!
>
> I Was told by Ms Kelly Wasko that I was never schedualed for the
> sergery!  Because Now I had never requested it!  All though I had
> repeatedly!!  Ms Wasko told me in grievance CAV 06/07-233
> (Nature of the case Supporting Document #18) to place a kite to
> request a segical consult which I did and recieved no appointment!
> I was charged for the NO SHOW appointment but never recieved
> one!  Ms Wasko did this in order to harass me and retaliate against
> me again for filing the grievances.  This is one of medicals tactics,
> When you start demanding reasonable medical treatment you start
> getting these charges for medical visits you never requested or
> received.
>
> I later found out by these grievances that I wasn't even going to
> get a sergical consult! (SEE Nature of the case Supporting
> Document ##18-26).

*Complaint*, pp. 5A-5B.

The plaintiff does not provide evidence to support these allegations.  The record

demonstrates that on August 23, 2004, the plaintiff was evaluated by P.A. Laurence for a request

for surgery on his wrists.  Laurence requested a referral to Dr. Go to follow up on the surgery

request.  On December 14, 2006, Dr. Beecroft documented that the plaintiff was scheduled to

return to Dr. Go on October 13, 2004, but the visit was "not completed" and that if he wanted to

"re-open the Carpal Tunnel issue, he had to kite into sick call."  On February 4, 2007, the

---

[6]I have copied the allegations as they were written without any attempt to identify or
correct errors.

plaintiff submitted a kite to sick call requesting a surgical consultation.  On February 9, 2007,

P.A. Laurence documented that the plaintiff did not appear for a clinic appointment which was

scheduled in response to the kite and that the plaintiff could resubmit a kite if he felt he still

needed to be evaluated for a surgical consult.  The plaintiff filed a grievance complaining that he

submitted a medical kite for a surgical consult, not for an appointment with medical staff.

Wasko responded to the grievance by stating that the plaintiff had to be seen by a DOC provider

in order to obtain a referral to a surgeon.  There is no evidence that the plaintiff ever submitted

another kite for a surgical consult, and there is no evidence that either Beecroft or Wasko

wrongfully denied the plaintiff a surgical consult.[7]

In his response to the Beecroft Motion, the plaintiff states that Dr. Beecroft removed him

from chronic care in retaliation for filing the 233 Grievance.[8]  *Response to Beecroft Motion*, pp.

2 - 3.  Although the plaintiff did not raise a retaliation claim against Dr. Beecroft in Claim 2, he

raises the claim in his description of the Nature of the Case.  *Complaint*, p. 3C, fourth paragraph.

I have liberally construed the Complaint as asserting a claim for retaliation against Dr. Beecroft.

Contrary to the plaintiff's assertion of retaliation, the record shows that the plaintiff was

removed from chronic care on December 14, 2006, id. at Ex. F, and that the 233 Grievance was

filed on January 3, 2007.  Id. at Ex. H, first consecutive page; *Response to DOC Motion*, Ex. H,

first consecutive page.  His removal from chronic care occurred *before* he filed his grievance.

---

[7]The plaintiff has also submitted eight declarations from inmates in an attempt to prove his case.  *Response to DOC Motion*, p. 2 and Ex. Y; Docs. #10 - 16.   However, the declarations do not show deliberate indifference on the part of any defendant.

[8]The plaintiff states that his removal from chronic care status is not an issue in this case. *Response to DOC Motion*, p. 7, ¶ 19.

Therefore, his removal from chronic care cannot constitute retaliation.  The plaintiff's claim for retaliation is frivolous.

### 3.   Claim 3

Claim Three alleges that Debra Howe, R.N., did not provide the plaintiff with emergency treatment for a broken thumb and finger on July 6, 2006, after he had "got into a fight in the Chow Hall."  *Complaint*, p. 6; *Response to DOC Motion*, p. 6, ¶ 13.  The plaintiff alleges that Howe refused to give him any treatment "even though it was a clear Medical Emergency."[9] *Complaint*, p. 6.  The plaintiff asserts that Howe told him he would have to be brought back to the medical department at a later date for any treatment.  He further states that his "complaints to Staff were answered with: 'FILL OUT A MEDICAL KITE" and that he "turned in medical kites on the 9th of July and the 11th of July which were unanswered."  Id.

The record demonstrates that Howe examined the plaintiff immediately after the fight. She documented that the plaintiff's knuckles were red on both hands and that the left hand was bruised and swollen over the area of the fifth finger.  There is no evidence in the record that Howe ignored a medical emergency, nor is there evidence that Howe had anything to do with the plaintiff's lack of treatment after she initially examined him.[10]

The plaintiff has not provided any evidence to show that Howe was deliberately indifferent to a serious medical need.

---

[9]Although the allegations of the Complaint are sworn as true, the allegations of the plaintiff's Response to DOC Motion are not.

[10]In addition, the record lacks any evidence explaining why the plaintiff waited three days to submit kites to the medical department.

## IV.   CONCLUSION

The plaintiff has failed to establish that the defendant's actions violated the Eighth Amendment.   Accordingly, I respectfully RECOMMEND that Defendant Beecroft's Motion for Summary Judgment [Doc. #134] and CDOC Defendants' Motion for Summary Judgment [Doc. #144] be GRANTED and that summary judgment enter in favor of the defendants on all of the plaintiff's remaining claims.

FURTHER, IT IS ORDERED that pursuant to 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), the parties have 14 days after service of this recommendation to serve and file specific, written objections.   A party's failure to serve and file specific, written objections waives *de novo* review of the recommendation by the district judge, Fed. R. Civ. P. 72(b); Thomas v. Arn, 474 U.S. 140, 147-48 (1985), and also waives appellate review of both factual and legal questions. In re Key Energy Resources Inc., 230 F.3d 1197, 1199-1200 (10th Cir. 2000).   A party's objections to this recommendation must be both timely and specific to preserve an issue for *de novo* review by the district court or for appellate review.   United States v. One Parcel of Real Property, 73 F.3d 1057, 1060 (10th Cir. 1996).

Dated January 11, 2010.

BY THE COURT:

 s/ Boyd N. Boland
United States Magistrate Judge